308 Ga. 283
FINAL COPY

S19A1299, S19X1300.  DeLOACH v. THE STATE; and vice versa.

ELLINGTON, Justice.

A Chatham County jury found Arheem DeLoach guilty of two counts of malice murder and other crimes in connection with the deaths of Rashad Biggins and Jamell Law.[1] In Case No. S19A1299,

---

[1] On March 29, 2017, the State charged DeLoach and his co-defendant, Tyrell Smith, with the malice murder of Biggins. DeLoach alone was charged with Law's murder. The 18-count indictment also alleged felony murder, conspiracy to commit murder, aggravated assault, armed robbery, and weapons possession offenses. In August 2017, a Chatham County jury found DeLoach guilty on all counts, except those pertaining to armed robbery and those involving the aggravated assault of Carshai Murray, which had been nolle prossed on the morning of trial. The court sentenced DeLoach to serve consecutive life sentences for the malice murders and a five-year prison term for possession of a firearm during the commission of a felony to run concurrent with the second life sentence. The remaining counts either merged or were vacated by operation of law. DeLoach timely filed a motion for a new trial, which he later amended. On April 22, 2019, the trial court entered an order granting in part and denying in part DeLoach's motion for a new trial. The order granted DeLoach a new trial as to all counts related to the death of Biggins; however, the order denied DeLoach a new trial on those crimes related to the death of Law. DeLoach filed a timely notice of appeal from the trial court's order on April 23. On April 24, the State filed a notice of appeal from the same order, and this Court docketed the State's appeal as a cross-appeal. The appeals were docketed to the August 2019 term and orally argued on September 11, 2019.

DeLoach contends that the trial court erred in denying his motion for a new trial with respect to the crimes committed against Law, asserting that his trial counsel was ineffective in two ways: (1) counsel failed to move to sever the counts involving Law from those involving Biggins, and (2) counsel failed to object or to move for a mistrial when the trial judge mentioned the appellate process before giving the final jury charge. For the reasons set forth below in Division 2, we disagree and affirm this portion of the trial court's judgment. In Case No. S19X1300, the State cross-appeals, contending that the trial court erred in granting DeLoach a new trial with respect to the crimes committed against Biggins.[2] The State argues that the trial court's basis for granting a new trial — that the prosecutor knowingly failed to correct material, false testimony from a key witness — is unsupported by the record. As set forth in Division 3, we reverse this portion of the trial court's judgment because the record does not support the trial court's finding that the

---

[2] Pursuant to OCGA § 5-7-1 (a) (8), the State may appeal from "an order, decision, or judgment of a court granting a motion for new trial[.]"

false testimony was material.

The facts relevant to both appeals are as follows. The State prosecuted DeLoach for the April 26, 2015 murder of Biggins and the June 20, 2015 murder of Law in the same trial on the theory that the murders were revenge killings linked together by forensic evidence and a witness to whom DeLoach admitted his involvement in both crimes. Viewed in the light most favorable to the jury's verdicts, the record shows the following.

Around 9:30 p.m. on April 26, 2015, Biggins was shot to death outside the Frazier Homes apartment complex in Savannah. He was shot moments after leaving the apartment of his friend, Morgan Suggs. Suggs testified that, as Biggins walked away, she heard a series of gunshots, saw Biggins fall, and heard him scream: "It's burning. It hurts. It's burning." Suggs did not see the shooting, but she saw two people running from where Biggins lay, one of whom she knew and identified at trial as Tyrell Smith. Suggs testified that she had seen Smith earlier that day when she and Biggins had been outside the apartment, supervising a group of children that Suggs

was babysitting. She said that Smith and a group of men, all of whom were wearing red shirts, had arrived at the complex in response to an argument involving the girlfriend of one of the men. When the group arrived, Biggins and Suggs took the children inside. Suggs testified that when she saw Smith later that evening, after Biggins had been shot, Smith had changed out of his red shirt and was then wearing all black.

When law enforcement responded to the shooting, Biggins was still alive. He later died from his wounds at the hospital. He had three gunshot wounds, one to his back, one to his right thigh, and one to the sole of his foot. Investigators photographed the crime scene, and gathered evidence of the shooting. They recovered seven .40-caliber shell casings and four 9mm shell casings. The shell casings were clustered together in two separate groups near bloodstains not far from Suggs' apartment, evidence from which a detective inferred that there had been two gunmen. Images of the shell casings were entered into a national database to be compared with other shell-casing images to see if the images from the Biggins

shooting matched those from other crime scenes.

Investigators obtained a warrant to search Smith's apartment on May 15, 2015. After removing an uncooperative Smith from his apartment at gunpoint, investigators seized his cell phone. Smith's phone records revealed that he had sent a series of text messages shortly after the shooting. At 12:07 a.m. on April 27, before information about Biggins' status had been released to the media, Smith sent a message to "Mafioso" stating: "Mission failed Cuzz bump me." A few hours later, Smith texted "Mugg," writing that, although the "mission" had failed, the victim had been shot twice, in the "back [and] side." Then, after Biggins' death was made public, Smith sent a text to "John Da" stating: "187BMC." The State presented evidence that "187" is code for "homicide" and that "BMC" stands for "Beast Mode Cousins." Each of these outgoing texts contained the signature line: "B.M.C. 4 LIFE R.I.P. MARVIN HILLS."

Forensic evidence gathered from the crime scene eventually led the investigators to the second shooter, DeLoach. A forensic expert

determined that the four 9mm shell casings from the Biggins shooting matched a single 9mm shell casing recovered from the scene of a shooting that had occurred on April 25, 2015, the day before Biggins was killed. On April 25, DeLoach assaulted his ex-girlfriend, Carshai Murray. Murray told the police that DeLoach was jealous and believed that she had been unfaithful to him. DeLoach, who was dressed all in black, surprised Murray by jumping out from behind bushes by her home. He then fired a gun at a car she was about to get into, and the driver of the car sped away. DeLoach told Murray: "I could have got you."[3]

On July 20, 2015, Jamell Law was shot to death with a .40-caliber weapon while he sat in his car on Harden Street in Savannah. Law had two passengers in the car with him. Before the shooting, Law had been seen driving through the neighborhood, looking for a friend. Minutes before the shooting, Law had robbed

---

[3] Although the State had charged DeLoach with the aggravated assault of Murray, the prosecutor moved to nolle pros the charges on the morning of trial after Murray informed the prosecutor that DeLoach had fired at the car instead of at her.

two people of their cameras. When Law stopped on Harden Street, three witnesses outside the car observed DeLoach and another man, Patrick Frazier, walk up to Law's car. DeLoach, who stood by the passenger-side door, told Law not to move and to "give me what you got." Law tried to roll up his window, but DeLoach snatched one of the cameras away from Law and then pulled a .40-caliber handgun from his pocket and shot Law in the neck. When Law sped off, DeLoach put his handgun in his pocket and walked away. After DeLoach was arrested, police searched his home. They recovered a pistol holster, a cell phone, and a shirt imprinted with the BMC catchphrase "R.I.P. Marvin Hills." The police found texts on DeLoach's phone that DeLoach had received after the Law shooting: "[A]ll I heard was a shot an[d] I couldn't tell if [yo]u or Pat shot [the man]." Followed by: "He['s] dead."

After he had been arrested for Law's murder but before he had been indicted for Biggins' murder, DeLoach told a fellow prison inmate, Trishon Collins, about how and why he had killed Biggins. Collins, who was then in jail on drug charges, initiated contact with

the detectives investigating Biggins' death, hoping that he might get leniency in his pending case for information concerning DeLoach's involvement in the Biggins shooting. In a video-recorded statement made on March 1, 2016, Collins told the detectives that DeLoach had recounted the following to him: DeLoach had seen Biggins at Frazier Homes on April 26. Later that night, DeLoach and Smith walked up to Biggins and opened fire on him. DeLoach used a 9mm handgun; Smith, a .40-caliber weapon. DeLoach shot Biggins because Biggins had previously shot him. DeLoach also told Collins that the .40-caliber handgun was "dirty" and had "a body on it," but that the police did not have the weapon. In fact, DeLoach had asked one of his "homeboys" "under him" to pass the gun on to others. DeLoach also told Collins that he was in jail on a more recent murder, but the police did not have the gun and they "only had Pat's" name.

A detective testified that the information that Collins provided him was consistent with the evidence they had so far discovered. Collins' statement also contained information that had not been released to the media or included in any written report that may

have been provided to DeLoach through the discovery process, such as the caliber of the weapons used. The detective also confirmed that DeLoach had been shot on July 14, 2014, but did not identify his shooter or cooperate with the police.

Although Collins testified at trial, he claimed that everything he had told the detectives during the interview was a lie. He testified that he had not talked to DeLoach, he was on drugs when he gave his recorded statement, and he did not receive leniency for testifying against DeLoach. In fact, when he testified at trial, Collins said that he had not yet been indicted.

*Case No. S19A1299*

1. DeLoach does not dispute the legal sufficiency of the evidence supporting his conviction for the malice murder of Law and possession of a firearm during the commission of that felony. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts at issue in this appeal, the evidence presented at trial and summarized above was sufficient to authorize

a rational jury to find DeLoach guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (1) (673 SE2d 223) (2009) ("It [is] for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. DeLoach contends that the trial court erred in denying his motion for a new trial on the charges related to Law's murder because his trial counsel was ineffective in two respects: (a) counsel failed to move to sever the counts involving Law from those involving Biggins, and (b) counsel failed to object or move for a mistrial when the trial court mentioned the appellate process before giving the final charge to the jury.

To prevail on his claim of ineffective assistance of trial counsel, DeLoach must prove both that counsel's performance was professionally deficient and that he was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104

SCt 2052, 80 LE2d 674) (1984); *Terry v. State*, 284 Ga. 119, 120 (2) (663 SE2d 704) (2008). To prove deficient performance, DeLoach must show that his counsel performed in an "objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." (Citation omitted.) *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). "[R]easonable trial strategy and tactics do not amount to ineffective assistance of counsel." (Citation omitted.) *Johnson v. State*, 286 Ga. 787, 791 (2) (692 SE2d 575) (2010). To prove prejudice, DeLoach "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). "This burden is a heavy one." (Citation omitted.) *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). And if DeLoach fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

(a) DeLoach contends that his trial counsel's performance was deficient because he did not move the trial court to sever the counts pertaining to Biggins from those pertaining to Law. DeLoach contends that the two homicides were completely unrelated and were joined only because each involved murder charges against the same defendant. The improper joinder of these offenses, DeLoach contends, greatly prejudiced his ability to defend himself.

During DeLoach's motion for a new trial hearing, trial counsel testified that he did not move for a severance because he believed that, even if the State had tried the cases separately, the prosecution may have introduced "other acts" evidence from one case into the other under OCGA § 24-4-404 (b),[4] most likely on the issue of intent.[5]

---

[4] OCGA § 24-4-404 (b) provides, in relevant part:
    Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident….
[5] "Other acts" evidence is admissible when
(1) the evidence is relevant to an issue in the case other than the defendant's character, (2) the probative value is not substantially outweighed by undue prejudice, and (3) there is sufficient proof for

Additionally, counsel feared that any delay in trying the cases would result in the State locating additional witnesses and developing new evidence. Trial counsel testified that, prior to trial, witnesses who would offer testimony pertinent to the charges involving Biggins, Law, or both had recanted or failed to appear, and that it was his strategy to capitalize on evidentiary gaps and other weaknesses in the State's case that then existed. The record shows that witnesses to both charges had either recanted their testimony in whole or in part or had refused to testify during trial, and that the State had to impeach them with their prior inconsistent statements. In fact, toward the end of the State's case, the trial court observed that the State's problem with uncooperative witnesses had bordered on the "ridiculous."

Generally, "[t]he failure to file a motion to sever does not

---

a jury to find by a preponderance of the evidence that the defendant committed the prior act. . . . On appeal, a trial court's decision to admit evidence pursuant to OCGA § 24-4-404 (b) is reviewed for a clear abuse of discretion.

(Citations and punctuation omitted.) *Fleming v. State*, 306 Ga. 240, 246 (3) (b) (830 SE2d 129) (2019).

require a finding of ineffective assistance since the decision whether to seek severance is a matter of trial tactics or strategy, and a decision amounting to reasonable trial strategy does not constitute deficient performance." (Citations omitted.) *Harris v. State*, 279 Ga. 522, 529 (6) (615 SE2d 532) (2005). DeLoach contends that counsel's strategy was unreasonable, arguing that, under OCGA § 24-4-404 (b), evidence from the Biggins shooting would not have been admissible in the Law case and vice versa.

In evaluating the reasonableness of trial strategy, every effort should be made "to eliminate the distorting effects of hindsight." (Citation and punctuation omitted.) *Davis v. State*, 306 Ga. 140, 143-144 (3) (829 SE2d 321) (2019). "Thus, deficiency cannot be demonstrated by merely arguing that there is another, or even a better, way for counsel to have performed." Id. In this case, even if DeLoach is correct in asserting that counsel may have successfully moved to exclude "other acts" evidence pursuant to OCGA § 24-4-404 (b), the admissibility of other acts evidence was not trial counsel's main concern. As counsel explained during the hearing on

the motion for a new trial, he believed that, at the time of trial, his client was better served by capitalizing on the weaknesses in the State's case rather than risking giving the State additional time to strengthen its case. During DeLoach's trial, the prosecution showed that common evidentiary threads wove through each of the crimes charged, including ballistic evidence, a revenge motive, an affiliation with the group BMC, and firearms that DeLoach shared with those "under him." The State may thus have been able to admit this evidence as intrinsic to the story of both murders.[6] And had the cases been severed for trial, the State may have been able to take advantage of any delay in trying the cases to further develop its prosecution theory.

Given counsel's founded belief that DeLoach was better served by proceeding to trial on the State's evidence as it then existed,

---

[6] Evidence is intrinsic when it is "(1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense." (Citations and punctuation omitted.) *Williams v. State*, 302 Ga. 474, 485 (IV) (d) (807 SE2d 350) (2017). "The limitations and prohibition on 'other acts' evidence set out in [Rule 404 (b)] do not apply to 'intrinsic evidence.'" (Footnote omitted.) Id.

counsel's strategic decision not to seek a severance of the counts was reasonable, and a decision amounting to reasonable trial strategy does not constitute deficient performance. See *Harris*, 279 Ga. at 529. Because DeLoach failed to show that counsel's performance was deficient in this respect, the trial court did not err in denying this claim of ineffective assistance of counsel.

(b) DeLoach also contends that his trial counsel should have objected or moved for a mistrial when the trial court made a statement referencing appellate review before its final charge to the jury. DeLoach argues that the court's statement violated OCGA § 17-8-57 (a) (1) because it could be construed as a comment on his guilt and that it prejudiced him because it lessened the jurors' sense of responsibility by intimating that DeLoach was going to be convicted.[7]

The trial court, before it began its charge, said:

A jury charge is definitely the least exciting part of

---

[7] OCGA § 17-8-57 (a) (1) provides that "[i]t is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused."

any trial. However, it is one of the most important parts of the trial because it is my opportunity to tell you the law. And I'm going to give you a copy of it. And I can give you multiple copies if you want, if you decide you want it. I need for you to listen and pay attention. I know you've been sitting there for a long time. I have too. We've all been listening, but this is crucial. I can't just hand it to you and say "go in there and read the law" because I'd get reversed probably. Or somebody would come down and say "that's really being bad, Judge." Because it's crucial that you hear every word of it and that you absorb every word of it. So be patient with me.

Trial counsel testified that he did not object because he "saw nothing wrong with what the judge was saying."

It is error for a trial judge in any criminal case to express or intimate an opinion as to the guilt of the accused. OCGA § 17-8-57 (a) (1). A trial judge's comment concerning the process or availability of appellate review in the case may run afoul of this rule if the jury may infer from the comment that the judge holds an opinion about the defendant's guilt.[8] However, it is not error when the trial court

---

[8] See *Gibson v. State*, 288 Ga. 617, 618-619 (2) (706 SE2d 412) (2011) (This Court reversed the defendant's conviction where the trial judge, in response to a request from the jury for exhibits, stated "it would be reversible error" if the court gave jurors certain exhibits during deliberations and that they "would have to try the case all over again." The comments required

references the appellate courts in a context that does not intimate that the judge holds an opinion on the defendant's guilt or lessen the jury's responsibility in making its decision. See *Mitchell v. State*, 293 Ga. 1, 3-4 (3) (742 SE2d 454) (2013) ("However, not all comments made by a trial court regarding reviewing courts or the appellate process require reversal of a conviction. Mere abstract references to appellate courts, which do not convey the trial court's opinion, are not necessarily reversible error." (citation and punctuation omitted)).

In this case, we conclude that the trial judge's statement that she would "get reversed probably" if she failed to read the jury charge did not violate OCGA § 17-8-57 (a) (1). The statement was not made in connection with any evidence against DeLoach or in a

reversal because they suggested to the jury that the exhibits were harmful to the defendant's case, that the defendant would be found guilty, and that a reviewing court would order a new trial, all of which intimated that the trial court believed the defendant was in fact guilty.) (punctuation and emphasis omitted)). Because trial court references to the appellate process pose a risk that the jury may infer a comment on the defendant's guilt, this Court has warned that "references should not be made to the reviewing courts by court or counsel except to cite their decisions." (Citation and punctuation omitted.) *State v. Clements*, 289 Ga. 640, 649 (4) (715 SE2d 59) (2011).

context that would have implied that the judge believed DeLoach would be found guilty because only he can appeal from a verdict in a criminal case. Nor did it suggest that the judge believed that the trial would necessarily end with DeLoach's conviction. The clear import of the judge's statement was that jury instructions are so important that her failure to read them would be a violation of her duty. Under these circumstances, the statement was not erroneous. See *Mitchell*, 293 Ga. at 3-4 (3). See also *Grissom v. State*, 296 Ga. 406, 413-414 (5) (768 SE2d 494) (2015) (The trial court's comment to counsel in the jury's presence about preserving for appeal their pre-trial objections to evidentiary exhibits did not convey the trial court's opinion as to the defendant's guilt and, therefore, did not constitute reversible error.); *State v. Clements*, 289 Ga. 640, 649 (4) (715 SE2d 59) (2011) ("[T]he trial court's statements here were in the context of juror orientation at the start of the trial when no evidence had been adduced and opening statement had not yet been held."). Because the judge's statement did not violate OCGA § 17-8-57 (a) (1), DeLoach has failed to establish that his trial counsel's decision

not to object to it constituted deficient performance. See *Duvall v. State*, 290 Ga. 475 (2) (b) (722 SE2d 62) (2012) (trial counsel cannot be deficient for failing to lodge a meritless objection).

*Case No. S19X1300*

3. The State contends that the trial court erred in granting DeLoach a new trial on the ground that the prosecutor knowingly failed to correct Collins' false testimony that he had not been offered a plea deal in exchange for his agreement to cooperate with the State in its prosecution of DeLoach.[9] Because the record does not support the trial court's finding that the false statement was material and prejudiced DeLoach, we reverse that portion of the trial court's order granting DeLoach a new trial on the counts pertaining to Biggins.

The knowing use of material, false evidence by the State in a criminal prosecution violates due process. *Giglio v. United States*, 405 U. S. 150, 153 (92 SCt 763, 31 LE2d 104) (1972); *Napue v.*

---

[9] In his brief in support of his motion for a new trial, DeLoach argued that the "facts present a serious constitutional issue of prosecutorial misconduct" because the prosecutor failed to correct witness testimony he knew to be false, which denied him due process of law in violation of the Fourteenth Amendment.

*Illinois*, 360 U. S. 264, 269 (79 SCt 1173, 3 LE2d 1217) (1959). This rule applies equally when the State, although not soliciting perjured testimony, allows such testimony to stand uncorrected after learning of its falsity. *Giglio*, 405 U. S. at 153; *Napue*, 360 U. S. at 269. Further, "it is of no consequence that the falsehood [bears] upon the witness' credibility rather than directly upon [the] defendant's guilt." *Napue*, 360 U. S. at 269. See also *Giglio*, 405 U. S. at 154. To prevail on this claim of error, DeLoach was required to show that the prosecutor knowingly failed to correct Collins' false testimony, and that the falsehood was material. *Washington v. Hopson*, 299 Ga. 358, 363 (2) (a) (788 SE2d 362) (2016). See also *Dinning v. State*, 266 Ga. 694, 696-698 (2) (470 SE2d 431) (1996) ("[A] *Giglio* violation does not automatically result in a new trial." Reversal is required "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (citations and punctuation omitted)).

(a) *False testimony*. Following the hearing on DeLoach's motion for a new trial, the trial court found (and the record supports) that

Collins repeatedly testified that he had not been offered a deal by the State in exchange for his cooperation and agreement to testify in DeLoach's trial. However, the record shows that Collins, in fact, reached a plea agreement with the State in exchange for his cooperation in the DeLoach prosecution and that Collins entered a negotiated guilty plea on August 22, 2016, which reflected that fact.

(b) *Knowing failure to correct.* During a May 31, 2016 status conference, the prosecutor informed the trial court and the public defender then representing DeLoach that Collins had been offered leniency in a pending criminal case in exchange for his cooperation in the DeLoach matter. That plea offer was negotiated between the public defender who represented Collins and a prosecutor who worked in the same office with the prosecutor who tried DeLoach.[10]

---

[10] The purpose of the status conference was to make the trial court aware of a potential conflict of interest concerning DeLoach's representation by the public defender's office. The trial court noted in its order that a transcript of this status conference had been "filed in the defendant's prior indictments," and the court listed each of the three case files containing the transcript. As such, both the transcript disclosing the plea agreement as well as the terms of the guilty plea itself were made a part of the public record well before the case was re-indicted in 2017. Thus, information concerning the plea deal was available to both the prosecution and defense.

During the status conference, the prosecutor said that he "assumed" that the offer would be accepted, but that the guilty plea had "not taken place yet." During the hearing on DeLoach's motion for a new trial, the prosecutor said he did not know how Collins' pending criminal case had been resolved by the other prosecutor, but that, when DeLoach was tried, he believed that no plea agreement between Collins and the State had been reached because Collins continued to bargain for leniency in exchange for his cooperation, asking for consideration that the prosecutor could not give.[11] Nevertheless, given that both prosecutors were part of the same office that prosecuted DeLoach, the trial court was authorized to impute to the trial prosecutor the plea prosecutor's knowledge that Collins had accepted the plea offer and had entered a guilty plea. See *Sargent v. Secretary, Fla. Dept. of Corrections*, 480 Fed. Appx.

---

[11] Complicating matters, the record shows (and the trial court found) that Collins had two separate criminal matters pending while the police investigated the Law and Biggins murders, the one to which Collins pleaded guilty in August 2016 and another that remained pending when Collins testified during DeLoach's trial. The prosecutor who tried the case stated that he was aware only of Collins' pending criminal case and that no agreement had been reached in that case for Collins' cooperation in the DeLoach prosecution.

523, 529 (11th Cir. 2012) ("The prosecution team is defined as the prosecutor or anyone over whom he has authority, and includes both investigative and prosecutorial personnel. But knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor." (citations and punctuation omitted)). The trial court concluded that the "State, whether based on information known by the prosecutor in the defendant's case or the prosecutor for the 2016 plea, was obligated to correct this false information from the State's own witness about the deal that was negotiated by the State's own office."

(c) *Materiality.* The trial court found that Collins' false statement that he had not been given a plea deal for his cooperation was material because the jury would have considered it in their assessment of Collins' credibility. For the following reasons, the record does not support the trial court's finding that the false statement was material.

The transcript of Collins' trial testimony plainly shows that he

was not a cooperative State's witness. In fact, Collins did not honor the terms of his 2016 plea agreement when he recanted his prior statement and gave testimony favorable to DeLoach.[12] Because Collins' trial testimony was inconsistent with what he had told a detective about the murders in his prior statement, the prosecutor had to confront Collins with his prior statement and lay a foundation for the statement's use as substantive evidence. That statement was recorded on March 16, 2016, before any prosecutor had met with Collins to discuss offering him leniency in his pending 2015 drug possession case in exchange for his cooperation in the DeLoach prosecution.

Given these facts, it would have been in the *State's* interest to correct Collins' false testimony about not having a plea deal and to offer evidence of the plea agreement. After correcting Collins' false testimony, the State could have argued that, when Collins gave his

---

[12] Collins agreed to cooperate with DeLoach's prosecutors, including but not limited to making himself available for preparation of the case and interviews. He also agreed to testify truthfully in all courtroom proceedinqs, and that any statements or interviews given by him regarding DeLoach were truthful and without material omissions.

recorded statement to the detective, it was in his interest to provide useful, verifiable, truthful information about DeLoach's involvement in the murders in order to convince a prosecutor to give him a plea deal. The State also could have argued that Collins later breached his plea agreement to testify truthfully for the same reason that he changed his story at trial: he was afraid of DeLoach and his BMC associates. Additionally, given that Collins' trial testimony was favorable to and tended to exculpate DeLoach, it would have been in DeLoach's interest not to impeach Collins' credibility and undermine his trial testimony. Consistent with that approach, DeLoach's counsel attacked Collins' prior recorded statement, arguing that Collins had lied to the detective about DeLoach's involvement in the murders because Collins hoped to be offered a plea deal. Finally, Collins amply demonstrated his questionable credibility at trial: He testified that he was on drugs when he gave his prior statement, and he claimed to be on medication during his trial testimony. He testified that he did not recall much of his statement and that he had lied to the police. Collins also admitted

that he had prior criminal convictions and pending criminal charges. Under these circumstances, we see no reasonable likelihood that Collins' false testimony about his plea agreement could have affected the jury's assessment of Collins' credibility and contributed to the verdict. See *Guzman v. State*, 941 S2d 1045, 1051-1052 (B) (Fla. 2006) (Given that the State's witness had been "amply" impeached by other evidence, the trial judge was justified in concluding that false testimony concerning the witness's agreement to testify for a $500 reward from the State was of "limited significance" and "immaterial" and therefore had no reasonable possibility of affecting the judgment of the factfinder.). Consequently, because the false statement in this case was not material, the trial court erred in granting DeLoach's motion for a new trial on this basis.

*Judgment affirmed in part and reversed in part. Melton, C. J., Nahmias, P. J., and Blackwell, Boggs, Peterson, Warren, and Bethel, JJ., concur.*

NAHMIAS, Presiding Justice, concurring.

I join the Court's opinion in full, but with respect to Division 2 (b), I note my continued belief that *Gibson v. State*, 288 Ga. 617 (706 SE2d 412) (2011), was entirely wrong in its holding that a trial court's passing reference to the appellate process in a criminal case is an expression of opinion as to the defendant's guilt that requires reversal under OCGA § 17-8-57. See *Gibson*, 288 Ga. at 620-627 (Nahmias, J., dissenting). The Court today purports to apply *Gibson*, but in reality distinguishes it further toward oblivion. This continues the practice that the Court began in the first case dealing with *Gibson*'s holding, see *State v. Clements*, 289 Ga. 640, 648-649 (715 SE2d 59) (2011), and has followed ever since, see *Grissom v. State*, 296 Ga. 406, 413-414 (768 SE2d 494) (2015); *Mitchell v. State*, 293 Ga. 1, 3-4 (742 SE2d 454) (2013). And I again follow the practice of suggesting that we would be better off simply overruling *Gibson* so that its holding can no longer be a basis for enumerating error that we will always — after finding some flimsy way of

distinguishing *Gibson* — conclude does not exist. See *Grissom*, 296 Ga. at 414-415 (Nahmias, J., concurring); *Mitchell*, 293 Ga. at 5-6 (Nahmias, J., concurring); *Clements*, 289 Ga. at 650 (Nahmias, J., concurring specially in part).

I am authorized to state that Justices Blackwell, Boggs, Peterson, Warren, and Bethel join in this concurrence.

DECIDED MARCH 13, 2020.
Murder. Chatham Superior Court. Before Judge Abbot.
*Steven L. Sparger*, for appellant.
*Meg E. Heap, District Attorney, Matthew Breedon, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Katherine D. Emerson, Assistant Attorney General*, for appellee.